We have four cases on the calendar this morning, a trademark case from the PTO, two patent cases, one from a PTO, one from a district court and an employee case from the MSPB that's not to be argued. The first case is Virginia Innovation Sciences v. Amazon, 2018-1495, Mr. Jackson. Thank you, Your Honor. May it please the Court. The district court erred in finding the 140 patent invalid under 101 because primarily the district court stripped away, didn't look at the claims, rather, as a whole and instead looked at each individual item and found that each of those items were by themselves conventional and ultimately, by ignoring the claim as a whole, found it was directed to an abstract idea. And then under the step two, found that there wasn't an inventive concept because, again, in the court's view, everything was conventional. It was already known and conventional, wasn't it, to have a server for handling online payment transactions with credit card information in which the server would be able to handle that in a secure manner? That was known, yes, Your Honor. But the difference here is the architecture as a whole that's in the claim. So it's not simply that there's an online payment server that you can send secure information, credit card information to. In fact, if you look at figure one of the 140 patent, that's an embodiment in which that occurs. Now, it happens to be a combined merchant server and credit card information processing server. And that's part of the concern behind the invention is the idea that to secure that credit card information, take it out of the hands of merchants who you may or may not want to have that information and instead direct that to a known secure server so that it can be securely processed separate from the selecting the items at what's called in the patent the WebDB server, and then the communication between the two servers, both the redirecting of the user from the WebDB server to the secure server as well as the confirmation information that's routed back automatically to the WebDB server so that on the merchant side of things, the computer can both update its inventory and receive the confirmation that the purchase has gone through or not. Let me try it a different way. If the goal is to try to do an online payment in a secure manner, what's the, I don't know, what is the inventive concept, what is the inventor's contribution beyond sending this server, a known server that can do the transaction securely? Well, a known server, again, if I could just caveat that a little bit, it was known to have a single server that received both merchant information, let the buyer shop, and then also submit that credit card information. That's figure one in the patent. What's novel, what's the inventive concept is the overall architecture that's shown in that system interact, and that interaction is recited in the claims. So that's the inventive concept here. And frankly, I'm sorry. You put me in the claim language, what is the inventive concept, according to you? It's the combination, Your Honor, let me look at my notes quickly here. It's the combination of both the payment server. No, what in the claim language, I'm looking at Claim 17. What claim language in there do you think articulates this innovative idea that you're describing? So in Claim 17, it's, I mean, I think it's multiple parts of this claim, Your Honor. It's receiving at the payment server, the credit card information, dot, dot, dot, after Receiving credit card information is not innovative or novel, right? It's the, yes, Your Honor, it's the combination. Yes, it is. Receiving credit card information is novel. No, I'm sorry, I was agreeing with you. Okay, good, got it. It's the combination of the pieces together, Your Honor. I still don't understand what pieces combined. Okay, it's the combination of the WebDB server, where the user browses and makes selections of items to be purchased. It's the, and that's what's referred to in the claims as the website, I'm looking for the claim language, Your Honor, website listing the items for purchase. That doesn't actually mention the server, does it? No, but it's the website. It's the website. Yes. Okay, so there's a website. Right. That's not novel. What's the, where is the innovation? Right, so the websites are known to operate on servers or other computing devices, servers typically, so it's the website listing the items, and then the purchaser selects the items for purchase, is redirected to a payment server, the payment server accepts the credit card information instead of accepting it through the item, the website listing the items, and then the credit card payment server processes the information with the various banks, sends the confirmation information back to... I don't know, I mean, you just, you want to make a transaction on a website, and instead of giving the website your credit card, it sends you to a secure server. Right. Hard for me to see how that's not an abstract idea. But if you... It's transmitting something from a location that's not secure to one that is, so it accepts credit card information for a sale. But it's the overall architecture, Your Honor. There is no overall architecture. You haven't described any architecture. You described a website, and you described a secure server. That's not architecture. In the communications between those, I mean, Your Honor, I would disagree, but in the communications among those pieces as well, so you have the buyer who's using his or her own computer to browse and make selection of items, but it's also then, it's the interplay between the two, the website listing the items and the payment server, how that's processed, and also the automatically updating the merchant server or the website listing the items with the confirmation and providing it, allowing it to update the inventory and confirm that the payment has been processed accordingly, whether it's... Do you want to address the other patents briefly in your speaking time? Yes, Your Honor. So, with the 398 patent, the district court, the district court's errors were in construing multimedia content item and destined for a destination device located within a home. So, the multimedia content item error was based on this idea that the district court said that the format of the item that's received from the Internet, some source across the Internet, typically, that whatever format is associated with that item has to be the same format that's applied to the display device. In this claim, in Claim 1, I believe it is, I'm sorry, yeah, Claim 1, we're talking about the television, but if you look at the claim itself, the claim says that it's not the unconverted, originally received multimedia content item that's applied to the television. It's the converted version. So, the converted version in the claim, it says it applies display formatting to the device. The district court completely ignored that, it missed that in its analysis and said that the formatting that's applied to the television has to be the same formatting that was associated with the multimedia content item when it was received initially. The second point with respect to destined for a destination device within the home, that error there really comes out of the idea that the district court was looking at the converting and applying the display formatting. This claim is directed to Figure 9, the embodiment of Figure 9 in the specification. And the district court, in Figure 9, what happens is that a multimedia content item is received by a cell phone. The cell phone relays that to what's referred to as an MTSCM in the specification. And the MTSCM is the thing that takes the file, applies the display formatting, and forwards it to the television. So, the claim says that the multimedia content item is received from the wireless terminal device. In that embodiment, the wireless terminal device corresponds to the cellular phone. So, the converting, the reception, the conversion, and applying the display formatting and sending it to the display device occurs in the MTSCM in Figure 9. I don't recall seeing anything in the specification that contemplated the user at the cell phone stage in the middle of embodiment Figure 9 or any other embodiment where there's a cell phone in the middle of the whole communication where the user, at that moment in time, selects the destination device. The specification is, I want to say, let me, if I could, Your Honor, check that quickly. The specification is silent, at least the portion I'm looking at here. I'll look again on the break, but the portion I'm reading here about Figure 9 is silent as to the user's involvement. So, it would permit the cell phone to be, perhaps, pre-configured to route it to the MTSCM or the user could make a selection and route it to the MTSCM. It's not dictated in the specification one way or the other. And the claims don't require it one way or the other either. I guess when I read the claim limitation of a multimedia content item originating from a source and then received by something, I assume it's a conversion module, received through a wireless network and from a wireless device, to me that strongly suggests that the multimedia content item, whatever it is, is originated somewhere outside at a source and then it gets funneled through a wireless network and through the cell phone to the unstated conversion module, as is. And there doesn't seem to be any contemplation or room for any alteration to said multimedia content item. Only until later in the claim, where later in the claim the unstated conversion module converts the multimedia content item into something called a converted multimedia content item. And now we know, at that moment in time in the claim, the multimedia content item, Format 1, has been reformulated into multimedia content item, Format 2. So, what's wrong with looking at the claim language in that way? I think you, if I'm understanding your statement, I think I agree with you 100%. So, in Figure 9, the item is routed through the phone, unchanged. Well, it could be unchanged. It's certainly not converted per the claim. It's the conversion module, the MTSCM, which is downstream of the phone, in the claim in Figure 9, as shown in Figure 9. That's the module that does the conversion. It applies the display formatting appropriate for the display device. And that's where the district court misread the claim. The district court was thinking the phone had to do the conversion. And that's why, if you look at that part of the claim where it says receiving and then converting, it's looking at the phone as doing that. And so, from that phone's perspective, it thinks that the multimedia content item... My understanding is you want the claim, multimedia content item, as used in the claim, to be open to the possibility of that multimedia content item being somehow altered, modified, reformatted in some way before the step of converting the multimedia content item into a converted multimedia content item. And the district court... You're right, there could be some loose language in there, but ultimately the district court ruled that the claim doesn't allow for that kind of alteration or modification of the multimedia content item before the actual expressed step of converting the multimedia content item. And so what I'm trying to find out from you and the remaining moments you have is what's wrong with that based on the claim language that says multimedia content item originates from a source and then it gets routed... That multimedia content item, as it originates from the source, gets routed through a wireless network and then routed through a cell phone. There's... I think that you're correct, Your Honor, and it touches on another error that the district court made, which I haven't discussed yet, but the item gets routed through the phone and to the conversion device. In the case of the accused products, it's the Amazon Fire TV and Fire Stick devices. That's where the conversion is done. That's the conversion in the claim. That's where the display formatting is applied for the destination device, typically a television. The error with respect to what's happening in the phone is that the district court resolved a factual error against innovation at the district court level regarding formatting and whether the file, in fact, changes or not. It's about compression and decompression? It's about, yes, compression and decompression. And the way the particular mirror cast accused functionality works... How does that change the formatting? It's just reducing the number of bits that are getting transmitted in the video signal in the format that it's in. That's our point, that the compression formatting is different from the display formatting in the claim. And I think that's part of the confusion that the judge had, was he was looking at formatting as being... It's all the same, and it's not. And in our specification, it talks about how files are downloaded using compression formats, fewer bits are transmitted, but it's not in the claim, but in the specification, it decompresses the file and then applies the display formatting. And that's the step that's recited in the claim. At the district court, we had 30B6 testimony from Amazon's witnesses explaining that the file format that the phone receives is the same file format that the phone transmits to the accused Fire TV devices. Counsel, you've just about consumed all of your bottle time, but let's see if from the other side we'll give you two minutes for a bottle. All right, thank you, Your Honor. Mr. Haddon. May it please the Court, Dave Haddon for Amazon. Just picking up on what Your Honor was discussing. You have it exactly right the way the patent works and the way Judge O'Grady understood it. There is, I think, a mistake in some language in his summary judgment order where he refers to being in the format of the destination device when I think he really meant essentially the converting device. So he clearly understood there was a conversion step just as you have articulated. And the issue at summary judgment was going back to how they're mapping this claim. They're mapping this claim to this use of mirror cast on a cell phone to a Fire TV device. And they're saying that the Fire TV device is what performs the conversion. So up to that point the received multimedia content item has to be what was received by the cell phone unconverted and it has to be destined for the television. And none of that is true in mirror cast as Judge O'Grady recognized because the way mirror cast works is it creates a new video stream of whatever is on the user's screen on their phone. So as Judge O'Grady properly recognized the video that you get in from the outside source on your cell phone stops at your cell phone. Mirror cast is a completely separate process that just samples the screen buffer on the cell phone and creates a new video stream of whatever is being displayed on your screen. It could be pictures of your kids it could be the home screen of your phone. Mirror cast knows nothing about this received video that may have come in to the phone originally. So it's a completely different video. When the video signal gets displayed on the phone then mirror cast is going to capture that. What mirror cast does is display it on the television. It doesn't capture the video signal. It just samples the frame buffer of the phone at a fixed 30 frame per second rate. It creates a new video stream from that sampling which will be of whatever is on the user's phone. It will be in a different format from whatever was received on the phone because the format is fixed by mirror cast. It has a fixed frame rate and it depends on whatever the resolution of the user's phone was rather than what the video was that was originally sent from the outside source. So Judge O'Grady got the concepts completely correct. Both that that cannot be the conversion can't happen at the Fire TV because what the Fire TV receives is not what the phone received from the when the video is received is not destined for a television or anything else other than the cell phone because all you're doing is downloading a video to your cell phone. Your Honor, we'll address the 140 patent. Yes, Your Honor. So as VIS's counsel acknowledged, the 140 patent explains that figure 1 is completely conventional including the 128 bit encryption the credit card processing the interactions between the user and an e-commerce site. So their argument below was that the magic and the invention in the 140 patent was  from this merchant server to the payment server. But there is nothing in the patent that describes how that switching is done. In fact, the claim itself just uses the passive voice it says the user was switched. It doesn't even explain who does the switching. And the expert at Summary Judgment acknowledged that there is no mechanism for performing that switching in the claim. So I guess in your view then, if the claim had recited some operation maybe even a simple operation transferring the customer from the merchant server to the payment server, in your mind then it would satisfy section 101? It would be a closer call. It depends on what that mechanism is. But here we have kind of the confluence of all the kind of 101 benchmarks, right? We have essentially a standard commercial transaction using admittedly conventional technology and when you get to the point of what the claim novelty is, there's nothing but an empty black box with a result. Did the district court articulate what the abstract idea is in this claim? I don't remember the district court saying under step one I have to figure out if this claim is directed to an abstract idea. I do conclude it's directed to an abstract idea and the abstract idea is X. What is X? I don't recall precisely, your honor. We argued this at the pleading stage and then it came up again at summary judgment. I believe it was processing a transaction with a secure payment server was the idea, at least the one that we proposed and I don't recall if Judge O'Grady articulated that again at summary judgment. But that was the basic idea. Let me go back to one point because there's some discussion about how there's a novel architecture here because there's two servers versus one. That is not true either. It's clear from the prosecution history there was this ogrum reference that explained essentially the same thing. A user would be worth making a purchase on a merchant website they would get to the payment stage and their computer would connect with a different server to complete the payment. Over and over again, the applicant distinguished ogrum by saying, no, the switching there is initiated by the user's computer. That's not what my patent does. So I'm different. What did the examiner's reasons for allowance say? That. That was the only thing. They said over and over again the switch is not initiated by the user's computer so it was allowed. There's no explanation of how the switching actually occurred which was the frustrating part when you got the claim construction where as you can see in the order Judge O'Grady basically throws up his hands and says, I don't know how to construe this I don't know how you can distinguish ogrum like they did and then have the switching point to anything concrete because there's nothing in the patent that explains how it actually happens. So this to me and I've argued several of these one-on-one cases, this is not even a close call. There is nothing in this patent that could be a specific solution or an improvement to computer technology. They're claiming the magic is in this switching but there's no mechanism to describe even how that would occur. The title reads Method and System for Conducting Business. Yes. It's a system for conducting business. So it's a business method with no technology using conventional admittedly conventional servers and encryption and then it adds this magic step that it is just a result. I guess the other side would say there was a problem. The problem was how do you do an online credit card payment with a server that is unsecure and then they said that's the problem. Here's our solution. Our solution is and the means of accomplishing a secure transaction is to transfer the customer from that initial unsecure server to a server that can handle the credit card payment in a secure manner. So that's what you call the abstract idea. They call a means of an application of the abstract idea. And if there was a means a technical solution for transferring the user from one server to another in a secure manner that was a solution to that problem, then they would be at least along the road to having a patentable idea. But they don't have that. So they haven't even started down the path. They're just claiming it would be awesome if you could do this. Let's claim the result. Is it correct that for the 844 patent it was a stipulation of non-infringement based on the claim constructions? Yes, sort of. VIS says we stipulate a non-infringement based on a claim construction. There was no actual stipulation. They got filed. It got sort of baked into the summary judgment record. But the court didn't rule on summary judgment. He accepted the stipulation. Correct. So what do I do if I am troubled by one of the claim constructions of the many with regard to the 844? That's a good question. I think you have to affirm. They stipulated in light of all the constructions that were withdrawn. I have the same lack of clarity on that issue. I think the short answer is there is no written description for these claims as the court found at claim construction. The only reason he didn't pull the trigger and rule that on summary judgment is because of this. I have no idea what you're talking about. None of that is in front of us. There's no holding of a lack of written description or anything like that. I'm sure as heck not going to do that on appeal. Written description is a question of fact. I don't even understand why you would make that argument. It's not in your briefs. It's not relevant. What's troubling me about the 844 patent in particular is claim 28 clearly specifies a wireless device. Claim 35 and 52 absolutely do not require a wireless device. He read a wireless device limitation into both of those claims and I'm not certain why. Sure, Your Honor. It doesn't say wireless device in 35 and 52 but it says wireless transmitter and it includes the same functionality. No, actually it says wireless communication channel. No, but there's also a wireless transmitter. So, if you look at 35 Claim 52 Well, I was starting with 35. I can go to 52. 52 says wherein the wireless signal transmitter is designated to This is at Appendix 141 And that's in 35 also? Yes. But that doesn't mean everything's done by a single wireless device. It doesn't mean all the steps in the claim are performed by a single wireless device. Well, I think it does for the same reason, Your Honor, which is that the claim requires the same identifier for the wireless signal transmitter that is used for both the wireless signal transmitter sends the item status signal, the diaper update in the specification. But it also has the same identifier has to be used for the purchase transaction. So, if you look at Well, let's look at Claim 35. I am, Your Honor. Claim 35 says an output interface is configured to communicate the information through a communication channel. Right? Yes. And so, that's the first time the claim refers to an output interface. Earlier in the claim it refers to this wireless device, wireless transmitter. Right? Yes. So, it stands to reason that the never-before mentioned output interface could be something different than the wireless transmitter. Yes, Your Honor. Okay, so, just if you could answer Judge Moore's initial question. Let's assume, hypothetically we're not going to sort out Claim 35 and 52 right now but let's assume for a moment, hypothetically we disagree with the District Court's construction that in Claim 35 and 52 just as in Claim 28, it's the wireless device slash wireless transmitter that is communicating across the communication channel. What does that do to the summary judgment of non-infringement? Does it necessarily require us to vacate it because the stipulation of non- infringement was predicated on all of the claim constructions that the judge did or was it merely just some of them? Like, for example, there's something about your accused product that if the other constructions were to be affirmed, there's just no earthly way that that accused product could infringe these claims as construed with the other limitations about an item status signal and detection of an updated condition. Yeah, there's an easy answer to that, right? The accused product was the dash button. So you push the button when you want to order something. There is no item status signal that is being associated or conveyed. There is no updated condition of a merchandise involved. Nothing is detected. There is no change in any condition of the merchandise. And the merchandise in the claim has to be the merchandise for which the updated status the changing condition was detected. There's no such thing in their mapping, right? At the lower court, it claimed construction. They took no position on any of these terms so they could make up a construction after the fact. Nothing to do with item status or updated condition or a change in the merchandise. So if item status signal is affirmed or updated condition of a merchandise is affirmed or even just the antecedent basis point that the merchandise has to refer to the merchandise for which the updated condition is detected, any of those there can be no infringement. Let me just follow up on the one point from Judge Moore because there is a requirement that all of this purchasing and updated signal transmitting is done by the same device. Because in claim 35 it says, wherein the system is further configured to identify a purchase request for the merchandise based on the recognition of the unique identifier corresponding to the purchases in around line 39 in column 17 appendix 141. So just like claim 28, though it doesn't talk about a wireless device, it talks about this wireless signal transmitter. There has to be one of those that has a unique identifier that is used both to send the updated status signal and also the purchase request because it is that identifier that has to be the purchase request. And that's the one device that... Counsel, as you see, time has expired. Do you have one final thought? No, I was just going to try to close the loop on those claims. They are consistent, though the language is slightly different. Thank you. Thank you. Mr. Jackson, two minutes for rebuttal. Can you answer the question about even if we were to agree with you about the meaning of communication channel and whether it could be a different device other than the wireless transmitter that's transmitting over that communication channel, just with respect to claims 35 and 52, what difference does that make for any infringement theory? Why wouldn't you still be stuck with non-infringement outcome in light of an affirmance of the claim construction for item status signal and updated condition and all of that? Your Honor, obviously we disagree that those constructions are correct and it's laid out primarily in our brief on that, but if any of these, because there wasn't a segregation of which claim term was dispositive, whether it required all of them, I think it has to be remanded to the district court for further consideration. I would just like you to explain what your infringement theory would be for Amazon's dash button. When item status signal and all the rest are getting affirmed in terms of their claim constructions. So the updated condition of the merchandise would be the status of the merchandise as to whether, first of all please start from the end. Merchandise can't be limited to a single item. It's referred to in specification, there's the inventory management aspect of the claims, of the specification and the claims, primarily figure eight I believe it is. So it's more than just a single item. How is the pressing of the dash button providing information about a detected change in some condition of the merchandise? I'm sorry, Your Honor. The detected change is also a mistake, an error. I know, I'm asking you, this is a hypothetical. Maybe it's not a hypothetical, but really let's just call it for now a hypothetical. Your Honor, I think I would have... What would be the infringement theory for your dash button when the claim requires the signal, the item status signal, to provide information about a detection of a change in condition of the merchandise? Your Honor, that's frankly a hypothetical I haven't considered prior to today and I'd like to... But you know your case, right? You know your case, it's pressing a button. The accused products, pressing a button in the process... To order more detergent or something like that. That's right, Your Honor. Okay, so I mean I'm just sitting here wondering what could you possibly say to Judge O'Grady to persist with an infringement theory? And the problem I'm having, Your Honor, is you're asking me to take some of the constructions and apply them as well as some constructions, which I'm assuming you're suggesting might be reversed and then try to do that analysis on the fly and I haven't prepared that, Your Honor. I don't understand. How do you not know whether you have to win on all four terms on appeal to prevail or not? How did you come to court not knowing that? I believe that we can prevail on... I think it's less than all of them, but I'm not... I think it's the communication, the longer one, which says configure to communicate the information for processing of the purchase request. That one we absolutely have to have reversed, Your Honor. That one requires, because of the way the court read it, it requires a single device to send both purchase requests. But that's not my question. My question is there are four separate claim terms, each which probably result in non-infringement. If we only reverse one, how do you not have non-infringement? I think item status signal we could prevail below. What if the construction were left intact? I think if it were left intact. How about an updated condition of merchandise? How could you possibly prevail on that, given the technology if you left intact that definition? A detected change, if the detected change is detecting that the inventory is low, then I think we would prevail on that. Again, it would have to be merchandise couldn't be limited to a single item, because we're not monitoring in the inventory control side, we're not monitoring a single item. It's a group. All the pressing of the button conveys is the desire for more of the product, more detergent for example. That's right. It doesn't convey any information that the customer has run out of detergent, or has fallen below a certain threshold amount of detergent in the household. It just wants more. I guess I'm at a loss why it's detecting a change in any condition. It could be that the person never had any detergent and for the very first time is requesting the detergent. I think that detecting a change, I'm not disagreeing that it wouldn't be a challenge to prevail. I wasn't counsel of record below, so I don't know the case as well as someone would, but having studied the record on appeal here, I'm not sure that we have the evidence necessary to make that call that we couldn't prevail below, because I think that you could, again, you're implicitly construing the detected change to mean it's got to be something automatic. I'm not sure that that's supported by the record, Your Honor. One last assembly question, so much as it is a statement. The only people that would benefit from this being vacated and remanded based on one of four possible bases for non-infringement are you, the lawyers. Because your client couldn't possibly benefit under these facts. You've articulated nothing at all that amounts to a legitimate theory of infringement. And if we do send it back under those circumstances, then I think that you ought to seriously be aware of the fact that I think the lower court would be within its right to consider fees and possibly sanctions against you if the case is not disposed of promptly upon the realization that there are three other separate bases for non-infringement, which you stood in front of our court and made a lot of hoopla with no sense at all about why they ought to nonetheless result in vacating. So I'm just putting that on the record so they can cite it to Liam O'Grady below. So if you don't come forward with some really legitimate arguments and this gets sent back, he understands what is going on. Thank you, counsel. Thank you. Case is submitted.